860 F.2d 987
 57 USLW 2320, 10 Employee Benefits Ca 1414
 Thomas G. ANDERSON, Plaintiff-Appellant,
v.
EMERGENCY MEDICINE ASSOCIATES, Chartered, a Kansas
Professional Corporation; Emergency Medicine Associates,
Chartered Money Purchase Trust; Emergency Medicine
Associates, Chartered Profit-Sharing Trust; L. Wayne
Capooth, as Trustee and Individually; George T. Grigsby,
a/k/a George T. Grigsby, Jr., as Trustee and Individually,
Defendants-Appellees.
 No. 85-1428.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 3, 1988.
 
 Alan A. Hazlett, Topeka, Kan. (Henry L. Hiebert, Topeka, Kan., was also on the brief), for plaintiff-appellant.
 Eldon L. Ford, Cosgrove, Webb & Oman, Topeka, Kan., for defendants-appellees.
 Before HOLLOWAY, Chief Judge, ANDERSON, Circuit Judge, and BRIMMER, District Judge.*
 HOLLOWAY, Chief Judge.
 
 
 1
 This case presents the issue whether a partial termination occurred, under the contractual provisions of pension and profit-sharing plans set up by the defendants-appellees to comply with ERISA and the Internal Revenue Code Sec. 411(d)(3), when plaintiff-appellant voluntarily quit. The district court held that no partial termination occurred and that plaintiff was therefore not entitled to recover non-vested contributions to his accounts. We affirm.
 
 
 2
 * FACTS
 
 
 3
 Defendant Emergency Medicine Associates (EMA) is a professional medical corporation. Defendants Drs. Capooth and Grigsby are officers, directors, and the sole shareholders of EMA. They are also the trustees of EMA's retirement plans. Plaintiff Dr. Thomas Anderson is a former employee of EMA.
 
 
 4
 On January 1, 1976 EMA set up two retirement plans for its employees: a money purchase trust[1] and a profit sharing trust.[2] EMA included the following clause in the profit-sharing and money purchase trust documents so that the plans would qualify for favorable tax treatment:[3]
 
 
 5
 Upon complete or partial termination of this Plan and Trust or the complete discontinuance of contributions to the Plan and Trust, all amounts allocated to Participants' Accounts as of the date of termination shall become fully vested in such Participants and shall not thereafter be subject to forfeiture.
 
 
 6
 I R. 19, 37.
 
 
 7
 EMA had four eligible employees when it set up the retirement plans: Drs. Peterson, Anderson, Capooth, and Grigsby. EMA's only business then was providing emergency room services to Stormont Vail Regional Medical Center in Topeka, Kansas. On October 12, 1978, after unsuccessful attempts to negotiate a new contract with EMA, Stormont Vail gave EMA 180 days' notice that they were terminating the contract. On November 29, however, EMA wrote Stormont Vail that they would stop providing services on February 28, 1979, before Stormont Vail's 180-day notice would have terminated the contract. On March 1, Drs. Anderson and Peterson, through their newly formed professional corporation styled Emergency Physicians of Topeka, left EMA and took over EMA's position at Stormont Vail.
 
 
 8
 The vesting schedule of each of EMA's retirement plans was the same: 50% after three years of employment, 75% after 4 years, and 100% after 5 years. I R. 17, 36. Dr. Anderson would have been 50% vested in both retirement plans if he had worked for EMA until the end of March. On March 1, however, when Dr. Anderson left EMA and began working for Emergency Physicians, he was 0% vested.
 
 
 9
 Dr. Anderson, through his attorney, later wrote to EMA suggesting that EMA's retirement plans may have partially terminated on March 1, 1979 when he and Dr. Peterson left EMA. If so, he became 100% vested in all contributions to his account. EMA took the position that the plans had not partially terminated and thus Dr. Anderson was entitled to nothing because he was 0% vested on March 1, when he left EMA.
 
 
 10
 Dr. Anderson then filed suit in the district court, claiming that EMA's retirement plans partially terminated when he and Dr. Peterson stopped working for EMA and that he was thus entitled to all the money contributed to his account.[4] After a bench trial, the trial judge made the following findings and rejected Dr. Anderson's claim:
 
 
 11
 The court concludes that plaintiff has failed to demonstrate by a preponderance of the evidence that he was terminated by EMA. Plaintiff contends that his termination, or at least the termination of either he or Dr. Peterson, was a foregone conclusion after Stormont Vail notified EMA that their contract would not be renewed. Thus, plaintiff argues that he should not be penalized for seeking other employment when he knows his discharge is inevitable.
 
 
 12
 We believe that plaintiff and Dr. Peterson made the decision to leave EMA and remain at Stormont Vail before EMA negotiated another contract and before it could have been decided that EMA no longer needed their services. Plaintiff and Dr. Peterson knew in October 1978 that they would be offered the emergency services contract with Stormont Vail. It was the defendants who were presented with a fait accompli when they learned that plaintiff and Dr. Peterson would be staying with Stormont Vail. We believe this is reflected in Exhibit 28, defendants' January 5, 1979 letter to plaintiff. This letter, which has been construed by plaintiff as a letter of termination, explains the pro rating of plaintiff's benefits as though the separation of plaintiff from EMA had long since been decided. We believe it had been determined long before the January letter, and that plaintiff and Dr. Peterson initiated the decision.
 
 
 13
 When the decision was made, it could not have been known whether EMA would need plaintiff's and Dr. Peterson's services in the future because no contract with another hospital was being negotiated. With hindsight one can see that all four doctors could not have been used for the EMA contract with Memorial Hospital. But other job opportunities for EMA may have been available when plaintiff's decision to leave EMA was made. Furthermore, three doctors could have been used for the Memorial Hospital contract. The court is uncertain that the loss of one doctor from EMA (25% of the labor force) constitutes a "partial termination" under IRS rulings. Our review of IRS rulings shows that losses of 70.6% (Rev.Ruling 72-439); 57.6% (Rev.Ruling 72-152 & 81-27): and 80% (Rev.Ruling 73-284) of a work force have been considered sufficiently significant to trigger a partial termination.
 
 
 14
 Regardless of the percentages, the court concludes that a partial termination did not occur in this case because Dr. Peterson and plaintiff chose to leave EMA, not at the request of defendants or because defendants were winding up part of EMA's business, but because they preferred the opportunity of providing emergency services for Stormont Vail as part of their own corporation to remaining with EMA.
 
 
 15
 Consequently, the court holds that defendants did not breach their contract with plaintiff, violate a fiduciary duty towards plaintiff, or violate any statutory obligation under ERISA.
 
 
 16
 Memorandum and Order, I R. 106-08 (emphasis added). Dr. Anderson appeals.
 
 II
 ANALYSIS
 A. Partial Termination
 
 17
 The primary issue presented by this appeal is whether the district court correctly held that EMA's retirement plans did not partially terminate on March 1, 1979 when Drs. Anderson and Peterson voluntarily quit working for EMA. If the plans partially terminated, Dr. Anderson is entitled to 100% of EMA's contributions to his retirement accounts.[5] If the plans did not partially terminate, he forfeited his rights to EMA's contributions to his accounts.
 
 
 18
 The findings of fact by the trial judge, quoted above, about the circumstances under which Dr. Anderson left EMA, are of critical importance. Dr. Anderson does not challenge those findings and he makes no claim that they were clearly erroneous. Instead, he argues that nevertheless there was a "partial termination" and he is entitled to recover all contributions to his retirement accounts.
 
 
 19
 The meaning of "partial termination" is a question of contract interpretation because the retirement plans are a contract between EMA and its employees. "[W]hether a partial termination occurred is a question of law, one which we review de novo." Sage v. Automation, Inc. Pension Plan and Trust, 845 F.2d 885, 890 (10th Cir.1988). Although the term is not described in the definitions section of either plans' documents, the parties apparently agree that the term "partial termination" in the retirement plans was intended to incorporate the administrative and judicial interpretations of the term as it now appears in Internal Revenue Code 26 U.S.C. Sec. 411(d)(3) (1982).
 
 
 20
 Dr. Anderson contends that he and Dr. Peterson were a significant percentage of the plans' participants--50%--so that when they left EMA the plans partially terminated within the meaning of Sec. 411(d)(3), regardless of whether they quit voluntarily or were fired. As noted, Dr. Anderson does not challenge the trial court's findings that he and Dr. Peterson voluntarily quit EMA.
 
 
 21
 In Sage, 845 F.2d at 890, we rejected this same partial termination argument now made by Dr. Anderson. We did so, interpreting the provisions of the prior statute, 26 U.S.C. Sec. 401(a)(7) (1970), which is equivalent to the statute applicable to Dr. Anderson's case, 26 U.S.C. Sec. 411(d)(3) (1982). In Sage, plaintiffs were seven employees of Automation, a small accounting services corporation, who voluntarily quit to work for a client of Automation. We said that:
 
 
 22
 After a bench trial, the trial court concluded that a partial termination of the plans, which would have entitled appellants to full vesting, had not occurred. Underlying this conclusion is the factual finding that appellants voluntarily left their employment with Automation. On appeal, appellants do not contest the trial court's factual findings on this issue, but renew their contention that partial termination of a qualified plan occurs as a matter of law whenever a substantial reduction in plan participants occurs in connection with a significant corporate event. Under appellants' approach, whether an employee voluntarily left an employer would not be considered. Rather, the focus would be on whether there was a significant reduction in the work force over a short period of time, without regard to the cause of the reduction.
 
 
 23
 Id. at 889.
 
 
 24
 We rejected Sage's contention. We held that in order for a plan to partially terminate, "the substantial reduction in plan participants must be attributable to 'involuntary exclusions' or 'employee terminations' from the plan. [citations omitted] Voluntary employee decisions to leave the employer ... do not constitute 'employee terminations' which would trigger partial termination." Id. at 891. Although Sage was decided under prior Sec. 401(a)(7)--the applicable statute before Sec. 411 was enacted--the law remains the same.
 
 
 25
 Prior to its amendment and the adoption of 26 U.S.C. Sec. 411(d)(3) (1982) in 1974, 26 U.S.C. Sec. 401(a)(7) (1970) read in part as follows:
 
 
 26
 A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable.[6]
 
 
 27
 The Treasury Regulations issued under Sec. 401 provided that a "termination" included a "partial termination."[7] Thus, the Treasury required full immediate vesting in some circumstances short of the complete termination of a retirement plan, even though the term partial termination was not in the Code.
 
 
 28
 26 U.S.C. Sec. 411(d)(3) (1982) was added to the Code in 1974, P.L. 93-406, Sec. 1012(a), merely to restate prior Sec. 401(a)(7) and, among other things, codify Treasury Regulation Sec. 1.401-6(b)(2), which stated that a termination included a partial termination.[8] Internal Revenue Code Sec. 411(d)(3) now likewise provides that a retirement plan will not qualify for favorable tax treatment unless:
 
 
 29
 [u]pon its termination or partial termination, ... the rights of all affected employees to benefits accrued to the date of such termination [or] partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable.
 
 
 30
 Because the amendments to the Internal Revenue Code since Sage were intended merely to restate the existing law and to codify the regulations issued under it, we will follow the holding in Sage. Under its rationale EMA's retirement plans did not partially terminate when Drs. Anderson and Peterson voluntarily quit. The district court correctly held that Dr. Anderson is not entitled to recover under the partial termination provisions of the plans.
 
 B. Fiduciary Duty
 
 31
 Dr. Anderson further contends that the defendants breached the fiduciary duties imposed on them as trustees by 29 U.S.C. Sec. 1104(a) because of their "lack of regard for [his] rights."[9] Brief of Plaintiff at 41. He argues that defendants took the position that the plans did not partially terminate, only to benefit themselves; the money forfeited from Dr. Anderson's profit-sharing account will go into the accounts of Drs. Capooth and Grigsby and the balance in his money purchase account will be used to reduce EMA's contributions to the money purchase trust in later years.
 
 
 32
 We disagree. Dr. Anderson's claim that the defendants breached their fiduciary duty to him depends upon his claim that the defendants incorrectly decided that the plans did not partially terminate. The defendants could not have breached their fiduciary duties by correctly administering the plans. Because we hold that defendants correctly interpreted the plans, we hold that they did not breach their fiduciary duties to Dr. Anderson. Further, we note that the profit-sharing trust documents clearly prevent the money in Drs. Anderson's and Peterson's accounts from benefitting Drs. Capooth and Grigsby. Section 4.03 of the profit-sharing trust plan provides that "[a] Shareholder Employee cannot have any Forfeitures allocated to his Participant's Account...." I R. 11.C. Attorney's Fees
 
 
 33
 Finally, both sides have requested that we remand the case to the district court to consider their requests for attorney's fees and costs. Dr. Anderson's request for fees and costs is unsupportable since he is not the prevailing party. With respect to the defendants' request, we are not persuaded that we should remand or award any attorney's fees. The district court had before it a memorandum of law, prior to its decision, that included a request for both costs and attorney's fees pursuant to 29 U.S.C. Sec. 1132(g).[10] However, the judge granted costs only, Judgment, I R. 109; we feel that he implicitly denied attorney's fees. We think this was not an abuse of discretion by the trial judge. Sage, 845 F.2d at 896. Moreover, we decline to award attorney's fees for this appeal to the defendants-appellees; costs will be allowed under the rules of this court to defendants-appellees as the prevailing parties on the appeal.
 
 
 34
 AFFIRMED.
 
 
 
 *
 The Honorable Clarence A. Brimmer, Chief Judge of the United States District Court for the District of Wyoming, sitting by designation
 
 
 [1]
 In money purchase pension plans, accounts are maintained for each participant and an employer contributes a definite amount annually to the plan on behalf of each participant. The participant's benefit upon retirement is the pension available from the accumulated contributions credited to his account plus interest earned
 
 
 [2]
 In profit sharing plans, accounts are maintained for each participant as in money purchase pension plans but contributions are more flexible. However, contributions to a profit sharing plan must be recurring and substantial, not merely a single or occasional contribution. Benefits are usually paid upon the occurrence of a specific event and are generally paid in the form of a lump sum or equal installments
 
 
 [3]
 The favorable tax treatment granted to qualified plans is substantial. Employers, within certain limits, are permitted to deduct contributions made to these plans whether or not the participants' interests are vested; earnings on the plans assets are exempt from tax; and participants defer payment of tax on employer contributions made on their behalf until they actually receive the benefits, generally after retirement when their incomes and hence applicable tax rates tend to be lower
 
 
 [4]
 The district court had subject matter jurisdiction to hear the case under 29 U.S.C. Sec. 1132
 
 
 [5]
 The parties stipulated that if the plans partially terminated, Dr. Anderson was entitled to full and immediate vesting. Pretrial Order, I R. 62
 
 
 [6]
 Current 26 U.S.C. Sec. 401(a)(7) (1982) provides:
 A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part satisfies the requirements of section 411 (relating to minimum vesting standards).
 
 
 [7]
 Treas.Reg. Sec. 1.401-6(b)(2) provided:
 [T]he term 'termination' includes both a partial termination and a complete termination of a plan. Whether or not a partial termination of a qualified plan occurs when a group of employees who have been covered by the plan are subsequently excluded from such coverage either by reason of an amendment to the plan, or by reason of being discharged by the employer, will be determined on the basis of all the facts and circumstances.
 
 
 [8]
 The Senate Report noted that "[u]nder present law, all accrued benefits in a qualified pension plan must become fully vested (to the extent then funded) in the event of a termination.... [T]he Committee bill makes clear that this rule of full immediate vesting is still to apply in the case of a termination, or a partial termination (Examples of partial terminations might include, under certain circumstances, a large reduction in the work force, or a sizeable reduction in benefits under the plan)." S.Rep. No. 383, 93rd Cong., 2d Sess., 1974 U.S.Code Cong. & Ad.News 4639, 4890, 4935. The Conference Committee agreed, noting that "[u]nder the conference substitute, as under present law, all accrued benefits in a qualified pension plan must become fully vested ... in the event of a plan termination.... [T]he rule of full immediate vesting is still to apply in the case of a termination, or partial termination of a plan.... H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess., 1974 U.S.Code Cong. & Ad.News 5038, 5058 (emphasis added)
 
 
 [9]
 29 U.S.C. Sec. 1104(a) (1982) provides that:
 [A] fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and ... in accordance with the documents and instruments governing the plan....
 
 
 [10]
 29 U.S.C. Sec. 1132(g) provides:
 In any action under this subchapter ... by a participant ... the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.