Otis ARMSTRONG, Plaintiff,

v.

BERT BELL NFL PLAYER RETIREMENT PLAN AND TRUST AGREEMENT; William V. Bidwill, James Kensil, Mike Lynn, Tom Condon, Edward R. Garvey, Dan Jiggetts, and Mike Brown, individually and in their respective capacities as members of The Retirement Board and Plan Administrator; and Carl C. MacCartee, Jr., M.C., James A. Nicholas, M.D., and John Feagin, M.C., individually and in their respective capacities as members of the Medical Advisory Board; and Myra Logsdon, Defendants.

Civ. A. No. 86–K–314.

United States District Court, D. Colorado.

Nov. 4, 1986.

William A. Richardson and G. Kellam Scott, Denver, Colo., for plaintiff.

C. Willing Browne, Hall & Evans, Denver, Colo., and Robert V. Atmore, Lindquist & Vennum, Minneapolis, Minn., for defendants Condon, Garvey, Jiggetts.

James A. Clark, Fred M. Winner, Baker & Hostetler, Denver, Colo., for all other defendants.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

### Introduction

Otis Armstrong is a former running back for the Denver Broncos. From 1973 through 1980, he enjoyed a respected career with Denver's football team. His athletic life came to an abrupt end, however, during the course of a Broncos game against the Houston Oilers on November 2, 1980. Since his injury on the gridiron, Armstrong has met his most implacable foe on the field of intractability against a home team, the National Football League's retirement plan. Each time he nears the goal line and is about to obtain the disability benefits which the plan promises to injured players, the yard markers are changed and the clock is stopped.

A multitude of players have shared the field with Mr. Armstrong over the six-year run of this senseless contest. Somehow, in the midst of all the time-outs, these players have benched the star player. This case is about Mr. Armstrong's last entrance after the two minute warning.

### Motions

This case has seen a bewildering array of motions. Several motions have overlapped or subsumed others.

■ At the October 3, 1986 oral argument before this court, counts three, four, five and six of Armstrong's amended complaint were dismissed. These counts all sought extracontractual and/or punitive damages. Such damages are not a proper element of recovery under the Employee Retirement Income Security Act. *Simmons v. Prudential Insurance Company of America*, 641 F.Supp. 675 (D.Colo.1986). The Armstrong complaint was brought under the aegis of ERISA, and so the dismissal was warranted.

At the same oral argument, I denied defendants' motion to dismiss the complaint for failure to exhaust administrative remedies. That doctrine has no application where exhaustion would prove futile. *See Association for Retarded Citizens in Colorado v. Frazier*, 517 F.Supp. 105, 113–118 (D.Colo.1981). As this opinion will demonstrate, my invocation of the futility exception could hardly be more strongly justified.

Since the hearing, I have also granted defendants' motion to dismiss counts seven and eight because of preemption by ERISA. Order of October 17, 1986.

As a result of these and other orders, the plaintiff's complaint has been trimmed so that only counts one, two, and nine remain.

The following additional motions are pending:

1. Plaintiff's motion for preliminary injunction seeking rescission and cancellation of arbitration;

2. Plaintiff's motion for removal of all plan trustees and for appointment of a receiver;

3. Motion of defendants Condon, Garvey, and Jiggetts for oral argument and evidentiary hearing;

4. Request of all defendants except Condon, Garvey, and Jiggetts to file counter-affidavits.

For the reasons expressed below, the three motions are denied. The request to file counter-affidavits is rendered superfluous by these denials, and hence the request is also denied.

### Chronology

Otis Armstrong injured his neck during preseason drills in July 1979. He subsequently experienced a numbness or tingling sensation in his extremities. He became unable to conceive of the location of his extremities in the space around him. This problem posed obvious difficulties for catching the football. He missed five weeks of action, but the problem abated enough after that time for him to participate in the 1979 season.

Fate was not so kind a year later. On November 2, 1980, while carrying the ball on a running play, Armstrong was hit by an Oiler lineman. His neck was reinjured. Armstrong has not played football since that date.

The injury caused severe pain. On December 4, 1980, Dr. Gary D. Vander Ark, one of plaintiff's treating physicians, described the symptoms as follows:

At the present time the patient still has pain in the neck. With certain movements he develops a tingling, heavy feeling in his extremities. He has noted this feeling most in his left arm and in his right leg. He notes particularly that this feeling can be brought on by tipping his head backwards.

Although he reported a gradual improvement in plaintiff's symptoms by May 1, 1981, Dr. Vander Ark simultaneously observed Armstrong "periodically awakes in the morning with severe pain and a knot in the back of his neck." Moreover, any significant improvement must have been short-lived, because almost three years later, on November 14, 1983, Dr. Jack A. Klapper described the same symptoms:

At the present time he has cervical, thoracic and lumbar pain as well as numbness in all four extremities. This is most severe in the left arm and right leg. He also complains of loss of strength which again is most noticeable in those extremities.... At the present time he takes 8–10 Percodan a day for pain and spasms.

More recently, on January 7, 1986, Dr. Carl C. MacCartee, Jr. issued this account of Armstrong's disability:

[I]t is obvious that he has sustained a real injury to the spine, which has caused his departure from professional football and has also devastated his life. He has on-going symptoms in the neck and back and all four extremities. Subsequently, he has had tremendous psychological instability, has been unable to cope in society, has been unable to maintain gainful employment, and has an ongoing addiction to drugs because of his pain.

In his quest for relief from the pain of his injury, Mr. Armstrong has consulted at least twenty different physicians, several of them on a multitude of occasions. He has also been the subject of an incredible barrage of medical tests. One of his physicians, Dr. Bernard Lerner, found

that Mr. Armstrong has ... been confused, indeed, almost to a point of paranoia with regard to both his medical injury, which had been, I believe, glossed over on a number of occasions, and with regard to council [sic] and suggestions by multiple members of the Bronco organization and physicians that were involved in Mr. Armstrong's care.

On November 5, 1980, only three days after the injury, Dr. Charles D. Bloomquist found plaintiff to be "an extremely well developed, well muscled, not acutely nor chronically ill appearing black male who is alert, oriented, pleasant and cooperative." By late 1983, though, the recurring pain of his injury and the emotional torment of his ongoing attempts to be recompensed for his disability had wrought devastating changes on Otis Armstrong. He began to drop in at his physicians' offices, often without an appointment, to request Percodan prescriptions for the severe pain he continued to suffer. *See, e.g.*, Dr. Vander Ark's notes of December 12, 1983. He also began to evince mild non-cooperative behavior. *See, e.g.*, the March 9, 1984 letter from Dr. L.M. Robertson, Jr. to Dr. Sam Downing, noting plaintiff's failure to return to the office with x-rays for evaluation. Dr. Robertson opined "that the patient has been given substandard medical care to allow for his present addiction." *Id.*

The institutional and procedural nightmare which gave rise to this horrific and tragic development began on March 11, 1981. On that date, plaintiff filed an application for line-of-duty disability benefits [1] with the board which administers the NFL retirement plan. LOD benefits are governed by article 6 of the plan. Section 6.1 requires the board to grant a monthly LOD benefit, for up to 60 months, for a player incurring a substantial disablement arising out of football activities. Substantial disablement is defined as a permanent disability which, in plaintiff's instance, results in a partial disability of "50% or more loss of the use of the neck or back." Section 6.4(A).

The board considered the reports of three physicians when it took up plaintiff's application at its September 22, 1981 meeting. Drs. Vander Ark and Vinod Sahgal both attributed plaintiff's disability to his football activities. Dr. Robert Mack's report, however, conveyed orally to the board by way of defendant Myrna Logsdon, ascribed plaintiff's problem to congenital spinal defect. In light of this divergence of medical opinion, the board decided to table plaintiff's application pending written clarification of Dr. Mack's report.

On May 6, 1982, the board denied plaintiff's benefits application on the basis of Dr. Mack's final opinion that the disability was congenitally based. The three board members who represented the NFL players [2] objected to this decision because other treating physicians, notably Drs. Vander Ark and L.M. Radetsky, had issued diagnoses which adopted a different position from that taken by Dr. Mack. The player representatives therefore moved for another doctor's opinion. The three management representatives on the board voted against the motion. Under the plan provisions as then written, motions with three votes or less did not carry. Therefore the players' motion lost in a 3–3 tie. The players then moved to take the case to arbitration. That motion was also defeated in a tie.

Otis Armstrong was not informed of the board's decision on his LOD benefits application until Myrna Logsdon wrote to him on October 29, 1982. Around the same time, the NFL players' collective bargaining agreement was being amended in settlement of a players' strike. Among other provisions, the new CBA obligated the plan to set up a Medical Advisory Board for use in resolving medical questions which arose

1. The plan also covers total and permanent disabilities. T & P benefits are treated in article 5. A player is totally and permanently disabled "if the retirement board shall find that he has become totally disabled to the extent that he is prevented from or unable to engage in any occupation or employment for remuneration or profit,...." Section 5.2. Award of the two different types of benefits, LOD and T & P, is reconciled by section 6.2(A). That section states: "A player who meets the requirements for a total and permanent disability benefit under article 5 shall be entitled in lieu of benefits under this article 6 for any month in which it is larger than the line-of-duty benefit."

2. The board has six members. Three of them represent NFL club management, while the other three represent the players. Affidavit of Robert J. Hartman, ¶ 3.

in the retirement board's consideration of benefits applications. The new CBA further amended the plan so as to send applications to arbitration should three board members so vote.

Meanwhile, on December 23, 1982, plaintiff moved for board reconsideration of his application pursuant to section 11.14 of the plan. On March 23, 1983 the board decided to reconsider plaintiff's application and referred him to a neutral neurologist for further examination. The report of this neurologist, Dr. Jack Klapper, found plaintiff to be 80% disabled in the neck or back. Dr. Klapper also found the disability to be due to football injury. However, in a letter accompanying the report, Dr. Klapper wrote: "At the present time the patient has symptoms of a cervical cord injury however, no objective physical findings are noted."

The board reviewed Dr. Klapper's report on December 15, 1983. Management seized on Dr. Klapper's failure to note any "objective physical findings" and discounted the report. Management thus cast its three votes in opposition to an award of benefits. Since four votes are still required to award benefits under plan section 8.7, the players' motion to award benefits to plaintiff failed yet again. Management then voted to send the case to the Medical Advisory Board, a maneuver which could be accomplished with only three votes under the new CBA amendments to section 8.7. Logsdon informed plaintiff of the results of this board meeting on December 27, 1983.

Upset with the recurring indecisiveness attending the board's treatment of his application, plaintiff himself wrote a letter to the board on February 28, 1984. This letter requested total and permanent disability benefits.[3] The letter is somewhat confusing because although plaintiff cites Dr. Klapper's report as support for his claim, that report dealt only with LOD benefits. Logsdon acknowledged receipt of Armstrong's letter on March 5, 1984. She noted the recent death of a MAB physician,

thus explaining why plaintiff's LOD benefits application had not yet been reviewed by that body. She also informed plaintiff that his application before the board was one for LOD benefits, not T & P benefits.

The application dragged on interminably. On December 20, 1984, plaintiff's attorney at the time, William McCarren, sought an explanation from Logsdon for MAB's incredible delay in reviewing the case. Shortly thereafter, on January 8, 1985, McCarren sought expedient MAB review from the plan's attorneys. On March 11, 1985, plaintiff himself wrote to the NFL Players Association, seeking to enlist their aid in his cause. None of these efforts had any apparent effect.

On April 22, 1985, McCarren wrote to the NFLPA. He pointed out the sixteen month lapse of time without any action since the board had referred the case to MAB. The letter also noted plaintiff's pending social security disability claim and indicated an intention to convert the LOD benefits application with the board to one for T & P benefits should plaintiff prevail before the social security administrative law judge. This communication likewise had no apparent effect.

It was not until the first of August, 1985 that the first report of the three MAB physicians was issued. This report, the product of Dr. James Nicholas, did not find an LOD disability greater than 50%. However, the report discussed the need to review the medical test results for corroboration. The only other Nicholas communication before this court, however, is a September 3, 1985 letter disagreeing with the diagnosis of Dr. Lerner.

The report of Dr. MacCartee, the second MAB physician, was released on January 7, 1986. This report is perhaps the clearest and most concise of the several dozen physicians reports in the record. Unlike Dr. Nicholas, Dr. MacCartee noted the difference between an LOD benefits determination and a T & P determination. He concluded plaintiff was not entitled to LOD

---

**3.** *See* note 1.

benefits, but that he should receive T & P benefits.

On February 21, 1986, plaintiff's current attorneys filed the instant lawsuit.

Having been served with process and under pressure, the board met six days later to take yet another look at plaintiff's application. Management exercised its three votes to remove the case from MAB and to place it in arbitration. This move was an apparent violation of sections 8.7 and 8.22 of the plan, and the players recorded their objection. However, management claimed arbitration would expedite resolution of the case rather than induce further delay.

The draft report of the third MAB doctor, Dr. John Feagin, was released a day later, on February 28, 1986. This report, therefore, could not have affected the board's decision on the previous day. The report is not a model of clarity but seems to state plaintiff should receive T & P benefits.

On April 9, 1986, plaintiff obtained a social security disability award from Administrative Law Judge Adam Gefreh.

This brief and nonexhaustive chronology of plaintiff's experience since his 1980 injury is replete with delays, confusion, stalemates, and inconstancy on the part of the board and the persons under its control. Otis Armstrong has been the unfortunate forgotten victim of the struggle between NFL management and players.

*Motion for Appointment of a Receiver*

■ The sordid chronology of this case prompted me to give serious consideration to appointment of a board receiver. I informed the parties of this possibility at the October 3, 1986 hearing. Thereafter, plaintiff moved for appointment of a receiver. I now have before me the briefs of the parties on this issue. Upon full consideration

of the record and briefs, I deny plaintiff's motion for removal of all plan trustees and for appointment of a receiver. The players' motion for an evidentiary hearing and oral argument on the appointment of a receiver is accordingly also denied.

The motion for appointment of a receiver is predicated on count 9 of plaintiff's amended complaint. I denied defendants' motion to dismiss that count at the October 3 hearing. However, I now find that count to be ripe for summary judgment.[4]

In count 9, plaintiff makes the following requests for relief:

1. removal of the management representatives and replacement by court nominees;

2. an order directing the board "to take the requisite action to cause the appropriate contributions of the NFL member clubs to be made to the plan";

3. ordering the plan "to make benefit determinations in accordance with plan documents";

4. ordering the plan "to make disability payments in accordance with ERISA and terms of the plan";

5. attorneys fees and costs.

The Hartman affidavit attached to the player representatives' opposition papers reveals a burgeoning dispute between the players and the NFL clubs over the issue of club contributions to the plan. That controversy has nothing to do with disposition of plaintiff's benefits application. No party to this litigation disputes the sufficiency of funds available in the plan for disbursal to plaintiff.[5] The affidavit of Thomas J. Condon, ¶ 3, shows the plan's assets exceeded $160 million in value as of March 31, 1985. Count 9 itself asserts the plan is overfunded. Our concern, then, is not with plan contributions to be made in the future. Rather, the issue facing us is the release to plaintiff of funds currently

---

4. The court may enter a finding of summary judgment *sua sponte*. *Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); Wright, Miller & Kane, *Federal Practice and Procedure:* Civil 2d § 2720 (1983). Plaintiff has been given sufficient advance no-

tice and an adequate opportunity to rebut defendants' arguments against count 9.

5. Consequently, no genuine issue of material fact exists.

available in the plan. Given the lack of any dispute on the availability of funds to pay to plaintiff, count 9 is ripe for dismissal by way of partial summary judgment. Therefore, count 9 is dismissed and the motion for appointment of a receiver is denied.

Furthermore, appointment of a receiver would raise a whole new host of issues which at best bear only a tangential relationship to this litigation. The delays attending resolution of plaintiff's benefits application would not be rectified by appointment of a receiver. Indeed, appointment of a receiver would doubtless be used as a reason for even more delay. Nor would appointment of a receiver allay my concerns over the blatant, inequitable treatment plaintiff has received. Rather, the most expeditious course of action lies in pursuing the arbitration already commenced.

### Arbitration

■ At a May 16, 1986 hearing in this case, I permitted arbitration to commence in the wistful hope that it would lead to a speedy resolution of plaintiff's application. Unfortunately, and in keeping with the character of this entire debacle, no such resolution has been reached. Arbitration began in May and a decision has yet to be made. According to counsel, briefs are to be submitted to the arbitrator by November 12, 1986. Under section 10 of article VII of the CBA, to which plan section 8.7 refers, "[t]he arbitrator will, if at all possible considering the arbitrator's schedule and other commitments, issue a written decision within 30 days of the submission of briefs."

Plaintiff has moved for rescission and cancellation of the arbitration. Plaintiff now renews this motion. Both motions are denied. However, I will rescind the case from arbitration should the proceedings be delayed more than 30 days from the date of the submission of briefs to the arbitrator. 6 C.J.S. *Arbitration* § 55 (1975); 5 Am. Jur.2d *Arbitration and Award* § 43 (1962); *see also Janmort Leasing, Inc. v. Econo-Car International, Inc.,* 475 F.Supp. 1282, 1293–1294 (E.D.N.Y.1979) [autocite] (court stays arbitration but includes "proviso that plaintiffs may move to vacate the stay should arbitration not be completed within six months after the entry of this order").

In light of the foregoing, it is ORDERED:

1. Plaintiff's motion for a preliminary injunction is denied.

2. Plaintiff's motion for appointment of a receiver is denied.

3. Count 9 of plaintiff's amended complaint is dismissed. The complaint now consists of counts 1 and 2.

4. Defendant players' motion for a hearing and argument on the motion for appointment of a receiver is denied.

5. Defendant management's request to file counter-affidavits is denied.

6. If no arbitration decision has been reached by January 3, 1987, then the case shall be withdrawn from arbitration. Trial will then commence on Monday, January 12, 1987 at 7:30 a.m. and will continue from day to day thereafter as time allows until completed. Should an arbitration decision be reached before January 3, 1987, then the parties may pursue whatever legal remedies are available to them.