Joseph V. MORALES, et al.

v.

PAN AMERICAN LIFE INSURANCE
COMPANY, et al.

Civ. A. No. 85–3323.

United States District Court,
E.D. Louisiana.

July 31, 1989.

Gerald Wasserman, Bach & Wasserman, Metairie, La., for plaintiffs.

Dermot S. McGlinchey, Eve Masinter, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., for defendants.

## ORDER AND REASONS

MENTZ, District Judge.

### BACKGROUND

Plaintiffs filed this suit against Pan–American Life Insurance Company (PALIC) and the PALIC Employee Retirement Benefit Plan (the Plan) as a class action [1] for penalties and damages for violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.* Plaintiffs also allege unjust enrichment and third-party beneficiary claims. Plaintiffs have exhausted all administrative remedies pursuant to Article VII, § 7.02 of the Plan.

Plaintiffs are former PALIC employees who worked in PALIC's Medicare Division. All PALIC employees, including plaintiffs, are participants in the Plan. The named fiduciaries of the Plan are PALIC and the Pension Committee, which consists of five appointed members. The Pension Committee is also the administrator of the Plan. Since January 2, 1957, PALIC has made all contributions to the Plan on behalf of all its employees.[2] Prior to that time, the Plan was also funded by employee contributions.

PALIC's Medicare Division was responsible for administering the Medicare Program in Louisiana pursuant to an agreement entered into in July, 1966 between the Secretary of Health and Human Services (SHHS) and PALIC. The contract provided

---

**1.** On May 27, 1987, this Court certified a class action as to those former employees who were non-vested participants of the PALIC Retirement Plan. The Court declined to certify the vested participants as a class.

**2.** *See* fn. 3.

that there shall be no profit or loss to the contractor. Accordingly, the SHHS reimbursed PALIC for costs it incurred in the administration of the Medicare Program, including pension contributions.[3] On December 31, 1984, the SHHS terminated its Medicare contract with PALIC, and PALIC closed its Medicare Division and either retired or laid-off the employees in that Division.[4]

Pursuant to the terms of the Plan, the non-vested participants did not receive any benefits upon termination.[5] Vested participants were entitled to a paid-up deferred annuity contract payable at age 65 [6] or, if their accrued benefits had a present value of $5,000.00 or less, they had the option of receiving their benefits in a lump-sum. In April, 1985, the PALIC Pension Committee unanimously voted to offer a lump-sum benefit to vested participants whose accrued benefits had a present value of $20,000.00 or less. This option was made retroactive to January 1, 1976.

There are sixty-two non-vested plaintiffs and six vested plaintiffs. The non-vested plaintiffs claim that the termination of the Medicare Division constitutes a "partial termination" of the Plan entitling them under ERISA, 29 U.S.C. § 1344, to a full vesting and allocation of the Plan assets among the participants and beneficiaries. The six vested plaintiffs are those who were eligible only for the deferred annuity because their accrued benefits were greater than $20,000.00.[7] They claim that the Pension Committee's decision to limit the lump-sum option to participants whose accrued benefits were $20,000.00 or less was arbitrary and capricious, entitling them to remedies provided by ERISA, 29 U.S.C. § 1132(a).

Plaintiffs, both vested and non-vested, also claim that PALIC and the Plan have been unjustly enriched by virtue of the termination of the Medicare Division and that, as third-party beneficiaries of the contract between PALIC and the SHHS, they are entitled to the profit. In essence, plaintiffs claim entitlement to excess pension fund contributions PALIC allegedly charged to the SHHS, which together with accrued interest, amounts to more than six times the amount PALIC calculates that it owes to the vested employees. Plaintiffs

---

3. Defendants submitted three affidavits that "[s]ince January 2, 1957, PALIC has made ... all contributions to the PALIC Retirement Plan for all of its employees." Although plaintiffs argue in their briefs that PALIC made no contributions to the Plan and that it was completely funded by the government, plaintiffs' statement of contested facts contains the following: "Since January 2, 1957, PALIC has not made all contributions to the PALIC Retirement Plan. Rather, the funds in dispute were contributed by the government for the benefit of plaintiff employees beginning July 1, 1966 through February 15, 1985." Plaintiffs submitted no evidence to support their contention or to contradict defendants' affidavits.

Review of the SHHS/PALIC contract (which was submitted to the Court by the SHHS appearing as *amicus curiae*) shows that the SHHS was obligated to *reimburse* PALIC for the costs it incurred in administering the Medicare Program. Reimbursement of the cost of administration of the carrier, as determined by the Secretary to be necessary and proper for carrying out the functions covered by the contract, is statutorily required by 42 U.S.C. § 1395u(c). There is no provision in the SHHS/PALIC contract for the SHHS to make direct contributions to the Plan, nor is there any evidence that the SHHS directly funded the Plan. In fact, the uncontroverted affidavit of Sidney A. LeBlanc, Senior Vice President of Financial Planning and Control for PALIC, establishes that the SHHS paid the cost reimbursement directly to PALIC, not the Plan.

4. Five employees remained in the Medicare Division to handle transitional work, and on completion of this work on February 15, 1985, those five employees were also laid off.

5. Non-vested participants consist of those employees whose employment with PALIC terminated prior to obtaining ten years of credited retirement service. There is no provision in the PALIC Retirement Plan for partial vesting.

6. The Plan provides that the amount of benefits shall be calculated in the form of a single-life annuity without ancillary benefits. There are three types of available annuities: (1) qualified joint and 100% survivor annuity; (2) qualified joint and one-half survivor annuity; or (3) single life annuity. *See* Plan, Article VII, § 7.03 and 7.04.

7. An original vested plaintiff, Ben McKown, was entitled to the lump-sum payment, but refused to accept the payment on the ground that he was arbitrarily and capriciously required to execute a release of all claims in order to obtain the lump-sum benefit. Since filing suit, he has settled his claim with the defendants.

also allege that PALIC diverted funds from the pension plan after it terminated the plaintiffs' jobs and comingled the funds with the general corporate assets of the company.[8]

Defendants moved to dismiss, or in the alternative for partial summary judgment, on the ground that plaintiffs' unjust enrichment and third-party beneficiary claims are quasi-contractual state-law claims which are preempted by ERISA. Defendants subsequently moved for summary judgment for the reasons that (1) there was no partial termination of the Plan and (2) the decision of the Plan administrator in the disbursement of pension benefits with respect to the Medicare Division participants was not arbitrary and capricious. Having reviewed the record and the law, the Court now decides both motions in favor of the defendants.

### PREEMPTION

■ Plaintiffs do not argue that they have a cause of action under Louisiana law for their unjust enrichment and third-party beneficiary claims. Clearly, if these claims were based on Louisiana law, they would be preempted because they "relate to" an employee benefit plan and they do not regulate insurance.[9] *See Pilot Life Insurance Company v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Mayeske v. International Association of Firefighters*, 1989 WL 37154 at p. 33–34 (D.D.C. March 30, 1989). Instead, plaintiffs contend that these claims are federal common law claims.

### FEDERAL COMMON LAW

The drafters of ERISA intended that federal courts would develop a federal common law to supplement the statutory scheme. *See* 120 Cong.Rec. 29, 942 (remarks of Sen. Javits). However,

[t]he claim that Congress intended for the federal courts to create a body of federal common law to govern ERISA cases does not [as plaintiffs suggest] give a federal court *carte blanche* authority to apply any prevailing state common law doctrine it chooses to ERISA cases. A federal court may create federal common law based on a federal statute's preemption of an area only where the federal statute does not expressly address the issue before the court.... Furthermore, when it is appropriate for a federal court to create federal common law, it may use state common law as the basis of the federal common law only if the state law is consistent with the policies underlying the federal statute in question; ... federal courts may not use state common law to re-write a federal statute.

*Nachwalter v. Christie*, 805 F.2d 956, 959–60 (11th Cir.1986) (citing C. Wright, *Law of Federal Courts* § 60, at 283–84 (3d ed. 1976); *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957); *Scott v. Gulf Oil Corporation*, 754 F.2d 1499, 1502 (9th Cir.1985)). *See also Cefalu v. B.F. Goodrich Company*, 871 F.2d 1290, 1297 (5th Cir.1989); *Cummings by Techmeier v. Briggs & Stratton Retire-*

---

**8.** Diversion and co-mingling of Plan assets are not alleged in the complaint, but are mentioned in plaintiffs' briefs to the Court. Plaintiffs did not assert a cause of action under ERISA for breach of fiduciary duty, perhaps because ERISA's provisions covering breach of fiduciary duty, 29 U.S.C. §§ 1104, 1105, and 1109, would not entitle plaintiffs to the quasi-contractual damages they seek. Any recovery for breach of fiduciary duty would inure only to the benefit of the Plan. *See Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). However, to the extent that plaintiff's allegations of diversion and comingling of plan assets may state a cause of action under ERISA for breach of fiduciary

duty, such claims would have to be dismissed as unsupported by any evidence of record.

**9.** ERISA preempts all state laws that "relate to" an employee benefit plan. 29 U.S.C. § 1144(a). A law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). As an exception to the preemption provision, ERISA saves from preemption any state law which regulates insurance. 29 U.S.C. § 1144(b)(2)(A). Laws which regulate insurance are those that are specifically directed toward the industry of insurance. *Pilot Life*, 107 S.Ct. at 1554.

*ment Plan,* 797 F.2d 383, 390 (7th Cir. 1986), *cert. denied,* 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 703 (1986); and *Van Orman v. American Insurance Company,* 680 F.2d 301, 312–13 (3d Cir.1982).

■ Creation of a federal common law of unjust enrichment and third-party beneficiary claims would be inconsistent with ERISA's terms and policies. ERISA specifically provides that benefit plans must be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), and the courts have sustained the primacy of plan provisions. ERISA's specific enforcement provisions found in 29 U.S.C. § 1132(a) focus on the terms of the plan.

> [A] plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits. Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits. A participant or beneficiary may also bring a cause of action for breach of fiduciary duty, and under this cause of action may seek removal of the fiduciary.
>
> .    .    .    .    .
>
> The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.

*Pilot Life,* 107 S.Ct. at 1556. These civil enforcement remedies are exclusive. *Id.* at 1555. There is no provision for quasi-contractual rights or damages. *See Bishop v. Osborne Transportation, Inc.,* 838 F.2d 1173, 1174 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988); *Varhola v. Doe,* 820 F.2d 809, 817 (6th Cir.1987); *Mayeske,* 1989 WL 37154 at p. 34; *Armstrong v. Bert Bell NFL Player Retirement Plan and Trust Agreement,* 646 F.Supp. 1094, 1095 (D.Colo.1986); *Simmons v. Prudential Insurance Company*

*of America,* 641 F.Supp. 675, 681–83 (D.Colo.1986).

Quasi-contractual remedies have no place where there is a contract between the parties. *See Cummings,* 797 F.2d at 390; *Van Orman,* 680 F.2d at 312–14; *Wishner v. St. Luke's Hospital Center,* 550 F.Supp. 1016, 1020 (S.D.N.Y.1982). If separately negotiated contracts to which the participants are not parties can govern the disbursement of plan funds, the plan itself becomes meaningless. To allow participants to recover on quasi-contractual theories would "upset the uniform regulation of plan benefits intended by Congress." *Howard v. Parisian, Inc.,* 807 F.2d 1560, 1565 (11th Cir.1987). In addition, "[f]orcing trustees of a plan to pay benefits which are not part of the written terms of the program disrupts the actuarial balance of the Plan and potentially jeopardizes the pension rights of others legitimately entitled to receive them." *Cummings,* 797 F.2d at 389. "The actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan." *Id.* (quoting *Phillips v. Kennedy,* 542 F.2d 52, 55 n. 8 (8th Cir.1976)). It is for these same reasons that oral modification of pension plans is impermissible under ERISA. *See Cefalu,* 871 F.2d at 1297; *Nachwalter,* 805 F.2d at 960.

■ Similarly, there is no provision in ERISA for quasi-contractual rights upon termination of a plan. As the United States Supreme Court recently held, ERISA's provision governing allocation of plan assets upon termination, 29 U.S.C. § 1344(a), entitles participants only to accrued benefits in accordance with the terms of the plan, whereupon any residual assets may revert to the employer. Participants are not entitled to benefits not accrued at the time of termination. *See Mead Corporation v. B.E. Tilley,* —— U.S. ——, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989).

■ In the case at bar, there is no contractual or statutory entitlement to surplus funds. Insofar as any surplus may exist, it

was not created with employee contributions. No statutory purpose would be served by creation of a federal common law of unjust enrichment and third-party beneficiary claims. For the reasons discussed, plaintiffs' common law claims of unjust enrichment and third-party beneficiary asserted in Count IV of plaintiffs' complaint must be dismissed.

## PARTIAL TERMINATION

■ The non-vested plaintiffs claim that the closing down of the Medicare Division constitutes a partial termination, pursuant to which 29 U.S.C. § 1344(a) requires an allocation of assets among the participants and beneficiaries. Whether a partial termination has occurred is a question of law. *Sage v. Automation, Inc. Pension Plan and Trust*, 845 F.2d 885, 890 (10th Cir. 1988). A partial termination occurs when, in connection with a major corporate event, a significant percentage of employees covered by the plan are involuntarily excluded or terminated from participating in the plan. *Id.* at 891 (citing *Kreis v. Charles Townley, M.D. & Associates*, 833 F.2d 74, 79 (6th Cir.1987); *Weil v. Retirement Plan Administrative Committee for the Terson Company, Inc.*, 750 F.2d 10, 12–13 (2d Cir.1984)). Thus, a voluntary decision to leave employment does not trigger a partial termination. *Id.* (citing *Weil* at 13). In addition to determining whether the number of employees terminated constitutes a significant percentage of the plan participants, the court must consider all other facts and circumstances. *Kreis*, 833 F.2d at 78–79.

■ There is no dispute that a major corporate event occurred with the closing of the Medicare Division on December 31, 1984. The parties differ as to whether the closing affected a significant percentage of the Plan's participants. All PALIC employees, not just the Medicare Division employees, are participants in PALIC's Retirement Plan. Even though the issue of par-

tial termination affects only non-vested participants, both vested and non-vested participants must be considered in determining whether a partial termination has occurred. *Weil v. Retirement Plan Administrative Committee for the Terson Company, Inc.*, No. 82–Civ–8468, slip op., 1988 WL 64862 (S.D.N.Y. June 15, 1988).

■ It is uncontested that in 1984 there were 835 participants in PALIC's Retirement Plan and that on December 31, 1984, the date the Medicare contract between the SHHS and PALIC ended, there were 107 PALIC employees in the Medicare Division. On that date, ninety-five employees were laid off and seven were retired. On February 15, 1985, the remaining five employees, who had stayed on to handle transitional work, were also laid off. It is also uncontested that in May, 1984, there were 159 Medicare Division employees.[10]

PALIC did not terminate any employees prior to December 31, 1984. Nevertheless, plaintiffs contend that the employees who left the Medicare Division between May and the time the Medicare contract was terminated did so *involuntarily*. Plaintiff did not submit any affidavits or other evidence to support this contention. On the other hand, PALIC submitted an affidavit that from June, 1984 through December, 1984, thirty PALIC employees were transferred to other positions with PALIC, that between May 21, 1984 and December 30, 1984, twenty-one PALIC employees resigned, and that one PALIC employee was discharged on June 25, 1984 for excessive tardiness. Thus, plaintiffs contend that 159 employees or 20.1% of the PALIC Retirement Plan Participants were involuntarily terminated due to the closing of the Medicare Division, while defendants contend that only 107 employees or 12.8% of the participants were affected.

The transferred employees should not be included with the number of employees involuntarily terminated as they remained PALIC employees and Plan participants,

---

10. Plaintiffs initially contended that there were 168 PALIC employees in the Medicare Division in May, 1984, but they did not submit any documentation to support that number. Defendants submitted evidence showing that number was 159. During oral argument on defendants' motion for summary judgment, plaintiffs conceded that the number was actually 159.

nor should the discharged employee be included because his termination was not in connection with a major corporate event. As to those employees who resigned, the court has no direct evidence as to whether the resignations were prompted by the impending closing of the Medicare Division. However, the circumstances are similar to those in *Weil* where the court stated that:

> Given that most of the divisions at which those terminated were employed were closed or moved, the court thinks it is a fair inference that these employees did not "voluntarily" leave their jobs even if they found other employment before their division actually closed. They really had little choice.

*Weil*, slip op. at 3.

Accordingly, the Court will include the twenty-one employees who resigned after May, 1984 with the 107 employees involuntarily terminated as a result of the Medicare Division closing. Therefore, the total number of employees involuntarily terminated due to the closing of the Medicare Division is 128, or 15.3% of the Plan participants.

ERISA does not define what percentage of employees is sufficient to constitute a partial termination. As a result, federal courts frequently refer to Treasury Department regulations and IRS rulings on the issue of partial termination.[11] The Treasury Department Plan Termination Standards used to assist IRS agents in determining whether a partial termination has occurred state that:

> [t]here is no fixed percentage of employees nor any fixed number of employees that we may set as guidelines. The facts and circumstances in each case must be considered. ... [A] 20% reduction in 'employees covered by the Plan' would not by itself constitute a partial termination. However, coupled with additional factors like a plant closing, a reversion of assets to the employer as a result of termi-

nation of the plan or prohibited discrimination, 20% might be enough."

*Weil*, slip op. at 3.

In the case at bar, plaintiffs have offered no facts, other than the closing of the Medicare Division and the termination of 15.3% of the Plan participants, to show that a partial termination has occurred. There is no evidence of discrimination or that any plan assets have diverted or reverted to the employer. The Plan remains in effect and, in fact, the number of participants actually increased subsequent to the closing of the Medicare Division. Defendants' uncontested exhibits show that the number of participants for the years following 1984 are: 905 in 1985; 857 in 1986; 807 in 1987; and 826 in 1988.

Considering the facts and circumstances, the Court finds that 15.3% is not a significant percentage. Other cases have found that percentages in proximity to 15.3% are not significant: *Kreis*, 833 F.2d at 83 (13.6% and 15%); *Babb v. Olney Paint Co.*, 764 F.2d 240 (4th Cir.1985) (14.7%); *Taylor v. Food Giant*, 1984 WL 8144 (N.D.Ga. Nov. 30, 1984) (13%); *Wishner*, 550 F.Supp. at 1019 (citing 9 Stand.Fed.Tax Rep. (CCH) ¶ 6911 (Sept. 11, 1978)) (16.7%). The fact that under ERISA, a plan administrator is not required to notify the employer about the departure of plan participants unless 20% or more of the total number of plan participants depart, also supports finding that 15.3% is not a significant percentage. *See* 29 U.S.C. § 1343(b)(3).

A 15.3% reduction in the Plan's participants in itself is not sufficient to constitute a partial termination, and there are no other facts which might persuade the Court that a partial termination has occurred. Accordingly, the Court finds as a matter of law that a partial termination of the Plan has not occurred.

■ Even if the facts supported finding a partial termination, plaintiffs would not be entitled to the alleged "surplus benefits." According to the United States Su-

---

**11.** The Treasury Department and the IRS are concerned with whether a partial termination has occurred because a retirement benefit plan may receive favorable tax treatment only if it recognizes that a participant's benefits are non-forfeitable in the event of a partial termination. *See* Internal Revenue Code, 26 U.S.C. § 411(d)(3).

preme Court opinion in *Mead Corp.,* 109 S.Ct. at 2162–64, 29 U.S.C. 1344(a) does not entitle plan participants to any residual assets which were not accrued benefits at the time of termination.

### LUMP–SUM OPTION

Under the recent Supreme Court opinion in *Firestone Tire and Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), an abuse of discretion standard applies only when the terms of the plan require deference to the acts of the plan administrator. *See Lowry v. Bankers Life and Casualty Retirement Plan,* 871 F.2d 522 (5th Cir.1989).

■ In the case at bar, the unambiguous provisions of the PALIC Retirement Plan grant discretionary authority to the Pension Committee. The Plan grants the Pension Committee discretion to interpret and construe the Plan, to determine eligibility, to authorize all disbursements and to perform such other duties as required by the Plan. Article XIV, § 14.03. The Plan also grants to the Pension Committee the power to offer forms of benefit payments in addition to those specified in the Plan. Article VII, § 7.05. Accordingly, an arbitrary and capricious standard of review applies to the Pension Committee's decision to offer the lump-sum payment to vested participants whose accrued benefits amount to $20,000 or less.

The correctness of the Pension Committee's decision is not the issue. Rather, the Court's duty is to determine whether the Committee's decision was made rationally and in good faith. *See Anderson v. Ciba–Geigy Corp.,* 759 F.2d 1518, 1520–21 (11th Cir.), *cert. denied,* 474 U.S. 995, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985).

The uncontested facts establish that in January, 1985, ballots to vote on a lump-sum option for participants with benefits having a present value of $20,000 or less were circulated to all Pension Committee members for a vote. By April 19, 1985, all Committee members had voted in favor of the proposal. This decision made the lump-sum option available to more participants. Previously, the lump-sum option was avail-able only to participants whose accrued benefits had a present value of $5,000 or less.

The uncontroverted affidavit of the Pension Committee Secretary, Joseph Piazza, establishes that the Committee's decision to increase the availability of the lump sum option was motivated by concern for the fiscal integrity of the Plan. It was the Committee's opinion that payment of a lump-sum of $20,000 or less would decrease administrative costs, such as the cost of maintaining records, including annuity computations, on retired or terminated employees. The Pension Committee also hoped to avoid the higher cost of purchasing annuities for amounts between $5,000 and $20,000.

ERISA does not require that plan participants be offered a lump-sum payment option. *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.), *cert. denied,* 459 U.S. 1039, 103 S.Ct. 454, 74 L.Ed.2d 607 (1982); *Ashley v. Hays,* 647 F.Supp. 251, 253 (S.D.Tex.1986). Similarly, there is no provision in the Plan which would entitle plaintiffs to a lump-sum option. An annuity is the only form of benefit to which plaintiffs are specifically entitled under the express terms of the Plan. However, as previously stated, the Pension Committee has discretion to provide forms of benefits in addition to those specified in the Plan. A plan participant "is entitled to his benefits ... but he ha[s] no absolute right under the Plan to the specific mode of payment that he requested." *Pompano,* 680 F.2d at 915. Where the plan administrator has discretion to determine the form of benefits, the exercise of that discretion in a financially effective and responsible manner should not be overturned. *See Denton v. First National Bank of Waco, Texas,* 765 F.2d 1295, (5th Cir.1985); *Fine v. Semet,* 699 F.2d 1091, 1095 (11th Cir. 1983); *Pompano,* 680 F.2d at 913–915; *Ashley,* 647 F.Supp. at 253.

One of the factors to consider in determining whether there has been an abuse of discretion is whether the administrator was operating under a conflict of interest. *Bruch,* — U.S. —, 109 S.Ct. at 956. However, as plaintiffs have not presented the conflict of interest argument to the

Court, and the Court is unaware of any facts which would support such an argument, it need not be addressed. *See Lowry,* 871 F.2d at 525.

The Pension Committee's decision to raise the limit on the availability of a lump sum option from $5,000 or less to $20,000 or less, was made in good faith. The Committee executed the increased lump-sum option in a reasonable manner. Article XIV, § 14.03 of the Plan provides that the Pension Committee may act at a meeting or in writing without a meeting. Former Medicare Division employees who had the lump sum option by virtue of the April, 1985 vote to increase the limit to $20,000, retroactive to 1976, were given notice of such eligibility. There is no evidence that the Pension Committee acted in bad faith. To the contrary, all evidence is that the Committee acted in what it believed to be the best interests of the Plan and its participants. Therefore, the Court finds that the Pension Committee's decision to increase the availability of the lump-sum option to participants with accrued benefits of $20,000 or less was not arbitrary and capricious.

Accordingly,

IT IS ORDERED that:

(1) Defendants' motion to dismiss plaintiffs' unjust enrichment and third-party beneficiary claims is GRANTED.

(2) Defendants' motion for summary judgment to dismiss plaintiff's claims related to partial termination and the lump-sum option is GRANTED.

(3) Judgment shall be entered dismissing plaintiffs' suit in favor of defendants, Pan–American Life Insurance Company and the Pan–American Life Insurance Company Employees Retirement Plan, plaintiffs to bear costs.

(4) Plaintiffs' counsel shall forthwith provide notice of dismissal to all absent class members and shall provide each class member with a copy of the Court's Order and Reasons.